ELLIOTTE GREENE, MARLON JONES, and )
LUIS SANTOYO, )
)
Plaintiffs, )
)
v. )    No.  12 C 8763
)
COOK COUNTY SHERIFF'S OFFICE, )    Judge Rebecca R. Pallmeyer
TONI PRECKWINKLE, In her Individual Capacity )
As Cook County Board President, DEWAYNE )
HOLBROOK, in his Individual Capacity as )
Chief of Police for the Cook County )
Sheriff's Office, and COOK COUNTY, )
)
Defendants. )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs are three employees of the Cook County Sheriff's Office who, during Todd
Stroger's term as Cook County Board President, held the title of "security specialist" and
provided driving and protection services for Mr. Stroger.  After Defendant Toni Preckwinkle was
elected Cook County Board President, Preckwinkle wanted no members of Stroger's security
detail to continue on her detail.  Defendant DeWayne Holbrook, then the Chief of Police for the
Cook County Sheriff's Office, transferred Plaintiff Luis Santoyo from the security detail to a
patrol position. Gary Hickerson, within the Department of Corrections, transferred Plaintiffs
Elliotte Greene and Marlon Jones to their previous positions within the Department of
Corrections.

Plaintiffs filed this § 1983 suit against Cook County; Toni Preckwinkle, in her individual
capacity as the Cook County Board President; the Cook County Sheriff's Office; and DeWayne
Holbrook in his individual capacity as the Chief of Police for the Cook County Sheriff's Office,
alleging that Defendants demoted Plaintiffs based on political considerations in violation of
Plaintiffs' First and Fourteenth Amendment rights.  Defendants seek summary judgment.  In
their motion [72], Defendants DeWayne Holbrook and the Cook County Sheriff's Office

("Sheriff's Office Defendants") argue (1) that the security specialist position is exempt from First Amendment protections because it is a confidential position, and (2) that Plaintiffs have not established a *prima facie* case of political retaliation. Defendants Toni Preckwinkle and Cook County ("County Defendants") have moved independently for summary judgment [77], similarly arguing that the position is exempt from First Amendment protections and that Plaintiffs have not established a *prima facie* case. County Defendants also urge that Toni Preckwinkle is entitled to qualified immunity.

The court concludes that Sheriff's Office Defendants' motion for summary judgment [72] must be denied. County Defendants' motion for summary judgment [77] is granted in part and denied in part. Defendants have not established that, as a matter of law, security specialists are confidential positions, and Plaintiffs have presented sufficient evidence to support a *prima facie* case of retaliation. Because Plaintiffs' right not to lose their job assignments for political reasons was not clearly established, however, Toni Preckwinkle is entitled to qualified immunity.

## BACKGROUND[1]

Plaintiffs Greene, Jones, and Santoyo are employees of the Cook County Sheriff's Office. Santoyo began working for the Sheriff's Office in 1995, Greene in 1999, and Jones in 2005; each one started out in the Department of Corrections as Correctional Officers. (Pls.' Resp. to CCSO Defs.' Local R. 56.1 Statement of Facts [86], hereinafter "Pls.' Resp. to CCSO

---

[1]     Defendants urge this court to strike several of Plaintiffs' responses to Defendants' Statements of Facts and portions of Plaintiffs' Statements of Additional Facts for failure to comply with Local Rule 56.1. (County Defs.' Objections to Pls.' Resp. to County SOF [92]; CCSO Defs.' Reply to Pls.' Resp. to CCSO SOF in Supp. of Summ. J. [94], 1–2.) The court declines the invitation. Plaintiffs' responses, although not pithy, adequately complied with the purpose and intent of the Rule and did not interfere with Defendants' ability to reply or the court's ability to organize the evidence. District courts are not obligated to require parties to unbundle factual allegations, if such unbundling is not necessary. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 633 (7th Cir. 2009) ("The district court no doubt *could* have required that [the moving party] 'unbundle' the factual allegation in Paragraph 33, but its determination that such 'unbundling' was not a necessary predicate to [non-movant's] compliance with the rule was, in the context presented here, hardly an abuse of discretion."). Of course, where Plaintiffs have not adequately responded to a fact, it has been deemed admitted.

SOF," ¶¶ 5–7.)  Santoyo was promoted to the Sheriff's Police in 1997 and Greene was promoted to Correctional Sergeant within the Department of Corrections in 2004.  (Pls.' Resp. to CCSO SOF ¶¶ 5, 7.)  All three Plaintiffs were assigned to Stroger's security detail and served in that capacity until Stroger's term ended on December 6, 2010.  (Pls.' Local R. 56.1 Statement of Additional Material Facts in Opp. to Cnty. [85] hereinafter "Pls.' SAF to County," ¶ 20.)

The detail operates as a hybrid entity reporting to supervisors in both the Cook County Board President's office and the Cook County Sheriff's Office.  Though the Cook County Sheriff's Office is not mandated by any ordinance or state statute to provide security specialists, (Pls.' Resp. to CCSO SOF ¶ 34), the security detail is composed of Sheriff's Office employees who remain employed by the Cook County Sheriff's Office (and paid out of the Sheriff's budget), but report to a director of the detail.  (Pls.' Resp. to County Defs.' Local R. 56.1 Statement of Facts [83], hereinafter "Pls.' Resp. to County SOF," ¶¶ 32, 48; Organizational Chart, Ex. 21 to Pls.' Appendix [89-21], hereinafter "Org. Chart," 3.)  The director of the detail in turn reports to the Cook County Board President.  (Org. Chart at 3; County Defs.' Resp. to Pls.' SAF [91], hereinafter "County Resp. to SAF," ¶ 9.)  The Chief of Police of the Cook County Sheriff's Office also retains authority over any police officers assigned to the detail.  (County Resp. to SAF ¶ 8.)

I.     Todd Stroger's security detail

Todd Stroger was elected Cook County Board President in November, 2006.  (Dep. of Elliotte Greene, Ex. 2 Pls.' Appendix [89-2], hereinafter "Greene Dep.," 12:8–9.)  During Mr. Stroger's campaign, from about August through November of 2006, Plaintiffs Greene and Jones volunteered one day a week as drivers and security specialists.  (Pls.' Resp. to CCSO SOF ¶ 12.)  Greene and Jones were both employed by the Department of Corrections at the time (Greene as a Correctional Sergeant and Jones as a Correctional Officer) and performed this volunteer work on their days off.  (Pls.' Resp. to CCSO SOF ¶¶ 5–6, 12.)  Shortly after Stroger's election, Stroger's Chief of Staff, Lance Tyson, called Brian Towne, then the Sheriff's Director of Administration, to request that the Sheriff's Office assign Greene to his security detail.  (Pls.'

Resp. to CCSO SOF ¶ 15.) About a year and a half later, on May 8, 2008, another position on the detail opened up, and Lance Tyson requested that Jones fill that position. (Pls.' Resp. to CCSO SOF ¶ 20; Pls.' Resp. to County SOF ¶ 10.) The parties dispute the reasons for these openings on the detail: Plaintiffs assert that the positions became available after a previous member of the detail retired. (Pls.' SAF to County ¶ 20.) According to County Defendants, Greene replaced Elmer Frazier,[2] a member of the detail "who was removed when Bobby [sic] Steele left office." (County Resp. to SAF ¶ 20.) The parties do not say who made the decision to remove Mr. Frazier. (See County Resp. to SAF ¶ 7 ("Elmer Frazier was removed before Todd came in to make room for Elliotte Green [sic]"); County SOF ¶ 56 ("Frazier was taken off the detail before Todd Stroger came in").) County Defendants assert that Jones replaced a member of the detail who was removed at Todd Stroger's request because Stroger's wife did not like his driving. (County Resp. to SAF ¶ 20.) The parties do agree that in each case, the Sheriff's Office honored the President's Office request and completed the transfer to assign Greene and Jones to the detail. (Pls.' Resp. to CCSO SOF ¶ 35; Pls.' Resp. to County SOF ¶ 51.)

In July, 2008, another member of the security detail retired, and Luis Santoyo took his place. (Pls.' Resp. to CCSO SOF ¶ 15.) Unlike Greene and Jones, Santoyo had not worked for Todd Stroger's campaigns before being selected for the detail. (Dep. of Luis Santoyo, Ex. 1 to Pls.' Appendix [89-1], hereinafter "Santoyo Dep.," 21:23–22:15.) Phil Stephens, the director of the detail at that time, had previously worked with Santoyo in the Detective Unit of the Sheriff's Police; Stephens recommended Santoyo for the job and ultimately called to offer him the position. (Pls.' Resp. to CCSO SOF ¶ 21; Santoyo Dep. at 12:15–13:2.) Before serving on Stroger's security team, Santoyo had been working temporarily as a patrol officer in the Police

---

[2]    County Defendants assert that interim County Board President Bobbie Steele (Todd Stroger's immediate predecessor) requested that Elmer Frazier be assigned to her detail. (County SOF ¶ 56.)

Department, though he spent the previous four years in the Special Operations Unit and technically remained assigned to that unit. (Santoyo Dep. at 10:5–11.) Santoyo testified that he requested the patrol assignment because he expected to move to Florida—he does not specify when—and transferring from patrol would be smoother; had he remained in Special Operations until he left, he would have needed to return to Chicago to testify even after the move. (*Id.* at 10:9–11:6.) But the Florida plans fell through, so Santoyo accepted the positon on the Stroger security detail. (*Id.* at 10:11–11:6.)

The procedure used to hire the three Plaintiffs—someone from the President's office, either Lance Tyson or Phil Stephens, would call the Sheriff's Office to request a particular assignment—was the procedure used throughout Todd Stroger's term for security detail appointments. (Pls.' Resp. to County SOF ¶¶ 50–51.) It is undisputed that if the President expressed a preference, the Sheriff's Office generally deferred to the President's choices. (Pls.' Resp. to CCSO SOF ¶ 35; Pls.' Resp. to County SOF ¶¶ 51, 54.) When Plaintiffs were assigned to the security detail, they remained Sheriff's Office employees, but received a higher rate of pay in return for longer hours and loss of eligibility for overtime pay. (Pls.' Resp. to County SOF ¶ 36; CCSO Defs.' Local R. 56.1 Statement of Facts in Support of Summ. J. [74], hereinafter "CCSO SOF," ¶¶ 37–38.)

Plaintiffs contend that their positions on the detail constituted a promotion and a raise. (Pls.' Local R. 56.1 Statement of Additional Material Facts in Opp. to CCSO [88], hereinafter "Pls.' SAF to CCSO," ¶ 21.) The exact amount of the pay difference is unclear, however: Santoyo testified that the person currently in charge of the security detail receives an annual salary that is $26,000 greater than Santoyo's current salary. (Santoyo Dep. at 60:8-19.) His own annual salary dropped $8,000 to $9,000 after being transferred from the detail, Santoyo maintains. (*Id.* at 45:21–46:3.) Greene testified that his current salary is $72,900, and that the salary he earned while assigned to the security detail was "[l]ess or more—no, I think more, I think I was making seventy-three with—I'd have to look at a piece of paper to recall." (Greene

Dep. at 99:14–22.) Like Greene, Jones could not specifically recall the pay differential. (Dep. of Marlon Jones, Ex. 3 to Pls.' Appendix [89-3], hereinafter "Jones Dep.," 19:4.) Brian Towne, The Sheriff's Chief of Staff, explained the source of the confusion:

> Their salaries were higher than their merit rank, I believe. It depends on what your seniority is, and the police officers make more money than correctional officers but, you know, the security specialists wouldn't be receiving overtime . . . and I think because of the long and unexpected hours, weekends and stuff that that's where the higher salary was, but I don't know if you broke it down by hour – by hourly wage, I wouldn't know if I would call that a promotion.

(Dep. of Brian Towne, Ex. 9 to Pls.' Appendix [89-9], hereinafter "Towne Dep.," 44:20–45:7.)

## II.    Plaintiffs' reassignment

Todd Stroger ran against several candidates in the 2010 Democratic primary and ultimately lost to Defendant Toni Preckwinkle. (Pls.' Resp. to County SOF ¶ 62.) The race was hotly contested and generated substantial ill will between Preckwinkle and Stroger. Stroger described their relationship as "frosty" and elaborated that the two had a "let's-not-speak arrangement." (Pls.' Resp. to County SOF ¶ 62.) Defendants Preckwinkle and Cook County assert that members of Stroger's transition team "either refused to cooperate, refused to speak with them, or gave them bad information." (Defs.' Preckwinkle and Cook Cnty.'s Local R. 56.1 Statement of Facts in Supp. of Summ. J. [76], hereinafter "County SOF," ¶ 66.) Accordingly, President Preckwinkle's administration "had no reason to believe that Todd Stroger's security detail who were with him 24/7 would be loyal or trustworthy." (County SOF ¶ 66.)

Exactly how the decision to transfer Plaintiffs from the detail came about is not clear. Brian Towne, the Chief of Staff for the Sheriff's Office, and John Keller, Preckwinkle's Chief of Staff, had a series of conversations in which they discussed the future of the security detail. (County SOF ¶ 71; CCSO SOF ¶ 44.) Through Keller, President Preckwinkle made clear to Brian Towne that she did not want to keep Todd Stroger's people on the detail and instead wanted to bring in her "own people." (Pls.' Resp. to CCSO SOF ¶¶ 42–43, 46.) Towne maintains that he repeatedly urged Keller to put the security detail in the Cook County Board

6

President's budget, in order to reduce financial strain on the Sheriff's Office and to clarify precisely who had authority over the members of the security detail. (CCSO SOF ¶ 45; Towne Dep. at 31:6–23.)  As Keller recalls, however, it was Towne who first asked whether Preckwinkle wanted to bring in her own security team, and Keller confirmed that he and Ms. Preckwinkle would prefer to do so, but only "if it was possible" under the existing personnel rules, because Keller was uncertain whether the President had authority to replace the detail. (County SOF ¶ 72; Dep. of John Keller, Ex. 12 to Pls.' Appendix [89-12], hereinafter "Keller Dep.," 58:1–59:24.)  According to Keller, Towne assured him that every new President selected his or her own detail, and the President's Office relied on this representation.  (County SOF ¶ 72.)  Keller further emphasized that he and President Preckwinkle

> would have only done something had we been told we could.  And so our recollection is that it didn't come up specifically that they were *Shakman* [protected by the ban on political hiring and firing] or not *Shakman*, but that we were told that we could . . . that there was the possibility of having our own people, and that they [the Sheriff's Office] were going to, you know, avail me of whatever processes that they had to make it happen.

(Keller Dep. at 68:13–21.)  Regardless of who brought up the topic first, as a result of these conversations, a few days before Preckwinkle was sworn in, Towne advised the Sheriff's Office that Preckwinkle did not want Plaintiffs on the detail.  He also notified Rosemarie Nolan, the personnel director for the Sheriff's Office, that the Plaintiffs' assignment to the detail was ending and that they needed to be reassigned to new positions. (Pls.' Resp. to CCSO SOF ¶ 49.)

The Plaintiffs were notified of their transfers rather abruptly.  On December 6, 2010, the morning President Preckwinkle assumed the position of Cook County Board President, Plaintiffs were denied access to the security office in the County building.  (Pls.' Resp. to CCSO SOF ¶ 59; County Resp. to SAF ¶ 22.)  Plaintiffs Greene and Jones had picked up President Stroger from his house and driven him, per their normal routine, to the County building for Toni Preckwinkle's swearing-in ceremony. (County Resp. to SAF ¶ 22; CCSO Defs.' Resp. to Pls.' SAF [95], hereinafter "CCSO Resp. to SAF," ¶ 22.)  They provided security services during the

ceremony, and then left the meeting early with Todd Stroger and drove him to breakfast. (*See* Pls.' Resp. to County SOF ¶¶ 20–21.) Plaintiffs assert that they left the meeting to go to breakfast "because they were still protecting the former County Board President" but returned after, expecting to resume their jobs for President Preckwinkle. (Pls.' Resp. to County SOF ¶ 21.) When they returned, they were denied access to the security office on the fifth floor of the County building. (*See* Pls.' Resp. to County SOF ¶ 22.) Confused, Greene and Jones reported to several different offices, eventually learning from Rosemarie Nolan, the Personnel Director for the Sheriff's Office, that they had been removed from the detail and would be reassigned to positions in the Department of Corrections. (Pls.' Resp. to CCSO SOF ¶ 61.)

Luis Santoyo arrived at the County building separately and was also denied entry to the security office on the fifth floor. (Santoyo Dep. at 39:1–8.) Santoyo then called Defendant DeWayne Holbrook, who was serving as the Chief of Police for the Cook County Sheriff's Office at that time. (County Resp. to SAF ¶ 23.) Holbrook confirmed that Santoyo was being transferred from the detail because "they got their own people." (*Id.*) Santoyo had hoped to return to Special Operations rather than his patrol position, but Holbrook told him that was not an option. (Santoyo Dep. at 70:4–7.) According to Holbrook, the Sheriff's Office needed more patrol officers because the office "was short through attrition and other things." (Dep. of Dewayne Holbrook, Ex. 10 to Pls.' Appendix [89-10], hereinafter "Holbrook Dep.," 31:13–18.) Holbrook signed a transfer order using a special "Chief's move" to assign Santoyo to patrol; Santoyo otherwise would have been required, under the terms of the collective bargaining agreement, to return to Special Operations, where he had been assigned prior to the detail. (Pls.' Resp. to County SOF ¶ 23; Santoyo Dep. at 70:16–71:3; Holbrook Dep. at 31:3–33:3.) Gary Hickerson, within the Department of Corrections, signed the transfer order moving Plaintiffs Greene and Jones from the detail to their previous positions with the Department of Corrections. (Dec. 7, 2010 Personnel Memorandum, Ex. 11 to CCSO SOF [74-11]; Pls.' Resp. to CCSO SOF ¶ 61.) When Plaintiffs were transferred from the detail, their salaries changed

accordingly; their base salaries were reduced, but they were once again eligible for overtime. (County Resp. to SAF ¶ 21; Pls.' SAF to County ¶ 21.)

## III.  Job responsibilities of security specialists

Defendant Preckwinkle testified that her concerns about keeping Plaintiffs on the security detail stemmed from her belief that they would not be trustworthy or loyal because of the political animosity between her and Stroger. (*See* Dep. of Toni Preckwinkle, Ex. 11 to Pls.' Appendix [89-11], hereinafter "Preckwinkle Dep.," 29:6–9 ("Loyalty and being able to keep confidences and being discreet are critical on your detail, and I had no reason to believe that any of those people [Plaintiffs] had those characteristics."); *id.* at 24:13–26 ("I never believed they could be – that I could trust them . . . [b]ecause they were Todd Stroger's detail.").) In their role as security specialists, Preckwinkle feared, the Plaintiffs would have the opportunity to overhear confidential conversations. (*See* County SOF ¶¶ 41, 47.) Members of the security detail receive a copy of the President's schedule at the start of each day, and begin their day by driving the President from his or her home to the office. (Pls.' Resp. to County SOF ¶ 38; Pls.' Resp. to CCSO SOF ¶ 30.) During the transport, the President sits in the back of the vehicle and two security specialists sit in front. (Pls.' SAF to County ¶ 6.) The security specialists are able to hear important and highly sensitive conversations in the car, Defendants contend. (County SOF ¶ 67; CCSO SOF ¶ 31; County Resp. to SAF ¶ 6.) Plaintiffs do not deny that this is possible, but they maintain that, while driving President Stroger, they did not listen to what was said because they were focused on driving and on scanning the road for potential threats. (Pls.' Resp. to County SOF ¶ 42; Pls.' Resp. to CCSO SOF ¶ 31.)

On arrival at the County building, the security specialists ensure that the President makes it safely into the building and into his or her office. They then wait in a separate office until the President needs to travel to another location. (Pls.' SAF to County ¶ 4–5.) While working for President Stroger, Plaintiffs assert, the security specialists did not sit in on meetings in the President's office. (*Id.*) Similarly, during President Stroger's lunch meetings, the security

9

specialists sat at a nearby table in the same restaurant and did not overhear conversations. (Pls.' Resp. to County SOF ¶ 39.) On weekends, members of the security detail drove President Stroger and his family as needed, including to family events. (Pls.' Resp. to County SOF ¶ 40.) Defendants note that Greene has been inside Stroger's home. (County SOF ¶ 40.) Given these responsibilities, Defendants characterize the security specialist position as one that requires an "intimate" relationship with the Cook County Board President. (County Defs.' Reply Mem. in Supp. of Mot. for Summ. J. [90], hereinafter "County Reply Mem." 4–5.)

After Plaintiffs were reassigned, there was no one immediately available to provide security for President Preckwinkle. (CCSO SOF ¶¶ 50–51.) Some of President Preckwinkle's volunteers from the campaign filled in for a few days, and the Sheriff's Office pulled in John Palcu, from the Forest Preserve, who had previously served on the security detail for John Stroger and Bobbie Steele and later became the commander of Todd Stroger's detail. (Pls.' Resp. to County SOF ¶ 30; Greene Dep. at 25:3–5, 29:1–19.) Thus, at least briefly, Ms. Preckwinkle brought in Plaintiffs' own former supervisor to serve on her security detail.

## IV. *Shakman* Decree

In 2010, both the County and the Sheriff's Office were bound by *Shakman* Consent Decrees. (Pls.' Resp. to County SOF ¶ 79.) The *Shakman* case, filed in 1969, was a challenge to political patronage practices throughout Illinois state and local government. *See Shakman v. Democratic Org. of Cook Cnty.*, 481 F. Supp. 1315, 1321 (N.D. Ill. 1979) *vacated sub nom. Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987).[3] The *Shakman* Consent Decree broadly

---

[3] Michael Shakman was an independent candidate seeking election as a delegate to the 1970 Illinois Constitutional Convention. *Shakman v. Dunne*, 829 F.2d 1387, 1388 (7th Cir. 1987). He filed suit on behalf of all other independent candidates, voters, and taxpayers challenging political patronage practices in the City of Chicago and Cook County. *Id.* After the parties entered a consent decree governing discharge practices, the defendants appealed only from the prohibition of politically-motivated hiring. *Id.* at 1393. The Seventh Circuit revisited the issue of plaintiffs' standing, and concluded that in light of new Supreme Court precedent, the independent voters, candidates, and taxpayers did not have an injury that was "fairly traceable" to the actions of the defendants. *Id.* at 1397. The Seventh Circuit vacated "[t]hose aspects of (continued . . .)

prohibits reliance on political considerations in employment decisions within the Sheriff's Office and within Cook County. (*Id.*) Certain positions are, however, exempt from *Shakman* Decree protections. The parties here agree that the security specialist position has never been listed on a *Shakman* exempt list. (County Resp. to SAF ¶ 18.) Because there was no written job description or official hiring plan for the security specialists when President Preckwinkle was searching for new members of the security detail, Brian Towne in the Sheriff's Office worked with the *Shakman* compliance monitor for the Sheriff's Office to develop a job description and hiring process for the security specialist positions. (Pls.' Resp. to County SOF ¶ 79.)

The final product of those efforts was a process memorialized in "Article W" to the Sheriff's Employment Action Manual ("SEAM"). (County Resp. to SAF ¶ 10.) Under Article W, the President or her designee selects a candidate for security specialist and forwards the name to the Sheriff's Office Chief of Staff and the *Shakman* compliance officers for the County and the Sheriff's Office. (County Resp. to SAF ¶ 13; Article W, Ex. 18 to Pls.' Appendix [89-18], hereinafter "Article W.") The Sheriff's Office then performs a basic background screening and delivers the results to the President or her designee to issue the final written approval or disapproval of the candidate. (Article W ¶¶ C–E.) Article W specifically, and repeatedly, prohibits either the Sheriff's Office or the Cook County Board President's Office from considering political affiliation in the hiring decision, and a designee from the County Board President's Office and the Sheriff's Office must sign a "No Political Consideration Certificate"

---

the complaint which challenge the patronage hiring practice of the defendants," *id.* at 1399, but clarified that:

> This appeal did not involve the plaintiffs' contention that politically-motivated discharges by the defendants are unconstitutional. That issue was the subject of a consent decree with respect to many of the defendants, and of the court's unappealed judgment with respect to other defendants. The district court continues to exercise jurisdiction to enforce its judgment with respect to those claims.

*Id.* at 1399, n.15.

confirming that politics did not play a role in the hiring process. (Article W ¶¶ I, II.E, III.D, IV.D; County Resp. to SAF ¶¶ 14–15.)

The job description for the security specialist position was issued on December 28, 2010. (County Resp. to SAF ¶ 1.) The job description lists the following "Key Responsibilities and Duties":

- Acts as a protective detail to an assigned Cook County elected official to ensure his/her physical safety at all times.
- Drives the lead vehicle, the Cook County elected official's vehicle or any follow-up vehicle, as required or assigned to ensure safety; follows all local and state laws in the operation of any motor vehicle.
- Provides security coverage as required at the Cook County elected official's private residence.
- Reviews and assesses information relevant to the assigned protective operation to anticipate problems or incidents.
- Responds to emergency situations.
- Is capable of handling threats or ambush situations; recognizes situations that require notification to a law enforcement agency; has knowledge of procedures and protocol to maintain any evidence required in any subsequent investigation conducted by a law enforcement agency.
- Serves as a member of an advanced team that plans and coordinates protective operations; conducts site surveys to assess factors affecting the protective environment of sites to be visited.
- Cooperates with and assists all law enforcements agencies, as needed.

(Job Description, Ex. 17 to Pls.' Appendix [89-17], hereinafter "Job Description," 1.) The bottom of the description also includes a notice that "[t]he Cook County Sheriff's Office prohibits all unlawful discrimination in its hiring and promotional practices." (County Resp. to SAF ¶ 1, Job Description at 2.)

Following the Article W process, Preckwinkle's team hired Delwin Gadlen, Kelvin Pope, and Keith McLendon for the security detail in the first week of January 2011. (Pls.' Resp. to County SOF ¶ 31; County Resp. to SAF ¶ 39.) Each of the three had volunteered as drivers and security guards for Preckwinkle during her campaign. (Pls.' Resp. to County SOF ¶¶ 31, 76–77; County Resp. to SAF ¶ 26.)

Plaintiffs filed this action on November 1, 2012, alleging that Defendants removed Plaintiffs from the security detail based on political considerations in violation of Plaintiffs' First

and Fourteenth Amendment rights. Plaintiffs seek compensatory and punitive damages and injunctive relief, including reinstatement to their Security Specialist title, rank, and pay rate. (Compl. [1], 6–7.)

## DISCUSSION

Two motions for summary judgment are pending, one filed by the County Defendants and one by the Sheriff's Office Defendants. Both motions argue (1) that the security specialist position is confidential and therefore exempt from First Amendment protections, and (2) that Plaintiffs have failed to establish a *prima facie* case of political retaliation. County Defendants also urge that Cook County Board President Toni Preckwinkle is entitled to qualified immunity.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Timmons v. Gen. Motors Corp.,* 469 F.3d 1122, 1125 (7th Cir. 2006) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). In determining whether a genuine issue of material fact exists, the court views the evidence in the light most favorable to the non-moving party—here, Plaintiffs—and draws all reasonable inferences in the non-moving party's favor. *Gillis v. Litscher,* 468 F.3d 488, 492 (7th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). The moving party has the initial burden to show that the evidence is insufficient to establish a material element of the non-moving party's case. *Celotex Corp.,* 477 U.S. at 322–23. If the moving party meets this burden, the non-moving party must then "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). A factual dispute is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Carroll v. Lynch,* 698 F.3d 561, 564 (7th Cir. 2012).

**I.**     **Defendants have not established that the security specialist position is a confidential position as a matter of law**

Defendants urge that summary judgment is appropriate because the security specialist position falls, as a matter of law, within the "confidential position" exception to the general prohibition on political patronage employment decisions. (Cnty. Defs.' Mem. in Supp. of Mot. for Summ. J. [78], hereinafter "County Mem.," 3–7; CCSO Defs.' Mem. in Supp. of Summ. J. [73], hereinafter "CCSO Mem.," 11–12.)   The First Amendment generally "forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power." *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 64 (1990).   Yet, when "the nature of the public official's job makes political loyalty a valid qualification for the effective performance" of the position, the general rule gives way. *Davis v. Ockomon*, 668 F.3d 473, 477 (7th Cir. 2012).   The Supreme Court has clarified that the test requires courts to undertake a "functional analysis" of the job responsibilities to determine whether political loyalty "is an appropriate requirement." *Branti v. Finkel*, 445 U.S. 507, 518 (1980).   As the Seventh Circuit has recognized, however, even after *Branti*, the older formal categories still have some purchase: when a position can be characterized as either "policymaking" or "confidential," that position will likely fall within the realm of legitimate patronage. *Davis v. Ockomon*, 668 F.3d 473, 477 (7th Cir. 2012).   That test is met here, Defendants urge: Security specialists are "confidential positions," they argue, and therefore, Defendants were entitled to consider political factors in filling those slots.

"The question of whether a position is exempted from the First Amendment patronage dismissal ban is a factual one that should ordinarily be left for a jury to determine." *Pleva v. Norquist*, 195 F.3d 906, 912 (7th Cir. 1999).   Courts may, however, resolve the question as a matter of law in two circumstances: (1) where the job functions are clearly defined by law, such as a state statute or local ordinance, *see Pleva*, 195 F.3d at 912; or (2) where a reliable job description provides a "safe harbor" for the defendant-employer's reliance on political factors.

*Riley v. Blagojevich*, 425 F.3d 357, 365 (7th Cir. 2005); *see also Ockomon*, 668 F.3d at 478. Neither circumstance presents itself here. No party has identified a state statute or local ordinance that outlines the job functions of a security specialist, and while there is a job description in the record, it does not require the conclusion that political factors were appropriate considerations in this case.

A reliable job description can serve as a safe harbor if it sets forth political affiliation as a requirement of the job. *See Riley v. Blagojevich*, 425 F.3d 357, 364 (2005). But if the job description is "unclear whether the job confers any policymaking or confidential discretion, then additional evidence would be necessary." *Id.* at 365. The language of the security specialist job description does not support Defendants' position that the security specialists exercise confidential discretion. Defendants note that the job description includes the following functions:

- ensure that the elected official is able to carry out Cook County policy . . .
- ensure [the public official's] physical safety at all times . . .
- provide security coverage as required, at the Cook County elected official's private residence . . .
- serve[] as a member of an advanced team that plans and coordinates protective operations; conduct[] site surveys to assess factors affecting the protective environment of the sites to be visited.

(Job Description; County Reply Mem. at 5.) Yet, as Plaintiffs note, this language includes neither "political loyalty" nor even "confidentiality" or "discretion" within the job description. Defendants argue that the broad statement that a security specialist ensures "that the elected official is able to carry out Cook County policy" means political considerations are appropriate. This broad statement does not recognize policy discretion in the security specialists themselves, however, and Defendants have not explained how the sentence otherwise reveals that "confidential discretion" is an important job function. Indeed, Defendants' proposed reading of the job description appears to be inconsistent with "Article W," developed in the very month when Plaintiffs were reassigned, which dictates the hiring process for security specialists. That Article states that "political reasons or factors . . . may not be considered in making selections

for these positions." (Article W at § I.) Although Article W also permits a security specialist to "be transferred at the discretion of the President/designee or the CCSO Chief of Staff," it imposes the requirement that any manager involved in the decision sign a certificate "verifying that Political Reasons or Factors were not considered in the transfer." (Article W. at §§ III.A, III.D.) These documents—which are at best unclear, and at worst explicitly prohibit the consideration of political affiliations—do not create a safe harbor which entitles Defendants to summary judgment as a matter of law.

Notably, even if the job description is read to support Defendants' position here, it would not be dispositive; the job description was not created until December 30, 2010, three weeks after the Plaintiffs were removed from their positions on the detail. A job description written in late December might codify existing practice; but to the extent it appears helpful to Defendants, it may be understood as a post-hoc effort to justify reliance on political considerations. Viewed in the light most favorable to Plaintiffs, the job description does not defeat their claims.

County Defendants respond to these concerns about the job description by noting that "both former President Stroger and President Preckwinkle testified that loyalty and trustworthiness are vital for this position." (County Reply Mem. at 2–3.) As Defendants emphasize, security specialists are able to overhear conversations in the car, they have access to the President's schedule, and they interact with the President's family. (County Mem. at 3–5.) Plaintiffs, who performed the security specialist duties for President Stroger, insist the security specialists do not overhear significant amounts of confidential information. It is possible for them to do so, Plaintiffs acknowledge, but they contend that their attention is focused on the road, and not the conversation. (Pls.' Resp. to County SOF ¶ 42; Pls.' Resp. to CCSO SOF ¶ 31.) They note, as well, that while the President conducts business in his or her office in the County Building, the security specialists sit in a separate office. (Pls.' SAF to County ¶ 4–5.) And, when the County Board President meets someone for lunch, Plaintiffs assert, the security specialists sit at a separate table and do not listen to the communications. (Pls.' Resp. to

County SOF ¶ 39.)  There are, in short, factual disputes regarding the job functions of security specialists and whether political loyalty is an appropriate consideration.  Resolving these factual disputes would require weighing evidence, which is inappropriate at this stage of the litigation. *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007).

Regardless of the specific job functions, Defendants argue, the unique combination of an intimate working relationship and strong political hostility requires summary judgment in their favor.  They rely on *Meeks v. Grimes*, 779 F.2d 417 (7th Cir. 1985).  In *Meeks*, former bailiffs of the Gary City Court, who were appointed by the judge they served, lost their jobs after the judge lost a contentious primary that "generated considerable ill will."  779 F.2d at 418.  After a bench trial, the District Court concluded that although the firings were political, they were exempt from First Amendment protection because the bailiffs were confidential employees.  *Id.* at 418.  On appeal, the Seventh Circuit acknowledged that:

> political antipathy can serve as a decent proxy for a lack of trust and loyalty where the employee's responsibilities include a duty to shield the decisionmaking process from the outside world.  The possibility of 'leaks' from employees with access to the sensitive information is a constant threat to any unit of government.

*Id.* at 420.  Seizing on this language, Defendants contend that because security specialists necessarily overhear at least some confidential information, President Preckwinkle was not obligated to keep Todd Stroger's political allies to provide security in private settings.  (County Reply Mem. at 4–5.)

The quoted language from *Meeks* may provide support for Defendants' argument here, but its holding does not.  The Seventh Circuit reversed the District Court's conclusion that the bailiffs were confidential employees, rejecting the argument that "access to court records when coupled with political animosity creates a serious threat of politically motivated breaches." *Meeks*, 779 F.2d at 421.  The court noted that the bailiffs "are duty-bound" to keep the information confidential, "and, while political affiliation may be an acceptable proxy for loyalty [and] trust, . . . it would cast the net of the [confidentiality] exception too wide to allow political

support to be used to extrapolate a tendency to breach a sworn duty, behave unprofessionally, or commit criminal acts." *Id.* Political animosity, even when coupled with access to confidential information, thus does not necessarily create an exception to patronage protections. There are, the court recognized, "circumstances in which the animosity engendered by a political struggle makes it impossible for two people to work together in an intimate environment," *id.*, but those cases are rare: unless the employer shows that the political animosity would "invariably lead to a[n] untenable work situation," then political considerations are constitutionally impermissible. *Id.*

Since *Meeks*, the majority of cases considering exceptions to the prohibition on political patronage address positions where plaintiffs exercised discretion over implementation of government policy. *See e.g., Embry v. City of Calumet City*, 701 F.3d 231, 236 (7th Cir. 2012) (Commissioner for Streets and Alleys of Calumet City is a policymaking position because the Commissioner oversees construction and repair of City's public ways and manages department's forty employees and four-million dollar budget); *Davis v. Ockomon*, 668 F.3d 473, 479 (7th Cir. 2012) (Senior Humane Officer for the City of Anderson, Indiana exercises policy discretion because the Officer is responsible for implementing and enforcing animal control statutes and regulations, including determining when to revoke licenses and permits); *Fuerst v. Clarke*, 454 F.3d 770, 773 (7th Cir. 2006) (sergeants in Milwaukee County Sheriff's Department are not policymaking officials because they exercise only modest supervisory authority over "the cops on the beat" and do not formulate departmental policy); *Riley v. Blagojevich*, 425 F.3d 357, 363–64 (7th Cir. 2005) (Assistant Wardens of Illinois state prisons exercise policymaking authority because they routinely stand in for the top prison official and make policy judgments for individual prisons); *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 757 (7th Cir. 2002) (Chief ALJ of the Illinois Department of Professional Regulations is a policymaking position because the combination of responsibilities includes "directing subordinate staff, formulating procedures for the hearing programs, advising peer review committees, developing

18

hearing program goals, and directing and implementing the program budget"; those duties show that the Chief ALJ "spends a considerable amount of time formulating policy and implementing broad goals."). There is relatively little guidance on cases like this one, where the position involves no policymaking responsibilities, but the job functions nonetheless include close personal contact with a chief executive and opportunities to overhear private conversations of a political official.

The handful of cases that do address such positions reveals that whether political affiliation is an appropriate consideration for a particular position is highly fact-specific. In *Matlock v. Barnes*, the plaintiff James Matlock was a legal investigator for the City of Gary's Law Department, where he investigated accidents and small property damage claims by taking statements from witnesses, taking photographs, and obtaining relevant medical and administrative records. 932 F.2d 658, 660 (7th Cir. 1991). Matlock was transferred to the Gary City Jail after a new mayor, whom Matlock had campaigned against, took office. *Id.* at 661. Matlock sued, arguing that his transfer was improperly based on political considerations. *Id.* On appeal from a verdict in Matlock's favor, defendants urged that the legal investigator position was a confidential position as a matter of law because Matlock "had access to all court files, [and defendants] lost confidence in Matlock's ability to safeguard the secrecy of the office upon seeing how close Matlock was" to the former mayor. *Id.* at 664. The Seventh Circuit was not persuaded. The court noted that "defendants could have established the confidentiality of Matlock's position by offering convincing proof of their unease about working in small quarters in direct and constant contact with Matlock," but the jury simply did not believe "defendants' professed concern." *Id.* at 665.

Next, in *Carlson v. Gorecki*, the Seventh Circuit again considered investigators: plaintiffs, who served as special investigators for the Kane County, State's Attorney's office, were responsible for locating and interviewing witnesses, serving subpoenas, and transporting witnesses to court. 374 F.3d 461, 465 (7th Cir. 2004). The Seventh Circuit noted that "[a]ccess

to confidential files by a lower-level employee who, while not a policymaker, is openly politically hostile, may be reason for termination," *id.* at 466, but concluded that the evidence was insufficient to establish as a matter of law that party affiliation was an appropriate requirement for the special investigator positions. *Id.* The court therefore affirmed the district court's determination that the defendant was not entitled to qualified immunity from suit.

Most recently, in *Benedix v. Village of Hanover Park, Illinois,* the Seventh Circuit considered the position of the Executive Coordinator of the Village of Hanover Park, which a new Village administration eliminated through an ordinance. 677 F.3d 317, 318 (7th Cir. 2012). The District Court granted defendants' motion to dismiss based on legislative immunity and plaintiff appealed, arguing that that the Village is not entitled to such immunity. *Id.* Bypassing that issue, the Seventh Circuit affirmed the dismissal on the ground that the Executive Coordinator position was a "confidential one." *Id.* at 320. According to the plaintiff's brief, the Executive Coordinator "reported directly to and worked closely with" the Village manager. *Id.* Accepting plaintiff's assertion that the position was not a policymaking role, and relying solely on plaintiff's own minimal description of her job functions, the Seventh Circuit concluded that the "a position as a policymaker's right-hand woman must be deemed a 'confidential' one." *Id.* at 320.

This case resembles *Matlock* and *Carlson*, where plaintiffs have some access to confidential information but are viewed by the new administration as political enemies. In those cases, the Seventh Circuit acknowledged that such a combination might, in fact, create an untenable working situation, but observed that the combination of access to confidential information and political hostility alone does not transform a position into a "confidential" position as a matter of law. President Preckwinkle may have genuinely believed that keeping Plaintiffs on the detail would have created precisely such an untenable work situation. But under the approach outlined by *Meeks, Matlock,* and *Carlson*, whether President Preckwinkle's belief was genuine or accurate, is for the jury to decide.

The facts surrounding this issue are heavily disputed. First, the parties disagree over how close Todd Stroger was to Plaintiffs, and therefore how much political animosity would have existed between Plaintiffs and President Preckwinkle. Defendants note that Greene and Jones volunteered one day a week during Stroger's campaign and were therefore political appointees. (Pls.' Resp. to CCSO SOF ¶ 12.) They also characterize Stroger and Greene as long-time friends from the same neighborhood (see County SOF ¶ 9), but Greene's testimony describes a more distant relationship. (See Greene Dep. at 25:16–24) ("I knew about him, and he knew about me . . . but it wasn't a personal relationship.") Furthermore, Santoyo appears to have no connection to Stroger other than working on his detail. Therefore, whether Plaintiffs can be fairly characterized as political enemies—and what information was available to President Preckwinkle about that issue—are open questions.

Second, Plaintiffs have presented evidence that even if there was political animosity, it would not have interfered with Plaintiffs' job performance. For example, Santoyo testified that he understood his job was "to protect the County board president, whoever that – no matter who it was." (Santoyo Dep. at 33:16–18.) Phil Stephens, the former director of the detail under Todd Stroger from 2007 to 2010 (County SOF ¶ 6), testified more colorfully: "Our responsibility is, we don't care who is president, democrat, republican, martian, you know, Satan himself, whoever; our job is, we work for the office of the president." (Dep. of Philip Stephens, Ex. 6 to Pls.' Appendix [89-6], hereinafter "Stephens Dep.," 59:24–60:3.) John Palcu, the director of the detail before Stephens, explained that the Plaintiffs "were professional enough to serve whoever was in the office. They know their duties." (Dep. of John Palcu, Ex. 7 to Pls.' Appendix [89-7], hereinafter "Palcu Dep.," 32: 12–14.) On this record, there are genuine questions of fact regarding the level of political animosity between Plaintiffs and Defendant Preckwinkle and whether any political animosity that did exist would have interfered with the Plaintiffs' job performance.

Plaintiffs have presented some evidence that their political views would not interfere with

their effective performance of the security specialist position. Defendants have not identified any state law, local ordinance, or job description that requires the conclusion that political loyalty—or even confidential discretion—is an appropriate qualification for the position. Defendants, therefore, have not met their burden of showing that the security specialist position is a confidential position as a matter of law.

## II. *Prima facie* case

Next, Defendants argue that Plaintiffs have failed to establish a *prima facie* case that they lost their positions as security specialists for political reasons.[4] The Seventh Circuit has repeatedly identified the specific elements a public employee must show to establish that an employment decision rested improperly on political considerations. *See Kidwell v. Eisenhauer,* 679 F.3d 957, 964–65 (7th Cir. 2012); *Zerante v. DeLuca,* 555 F.3d 582, 584-85 (7th Cir. 2009). Specifically, a nonexempt employee can establish a violation by demonstrating (1) that his conduct was constitutionally protected; (2) that he suffered an actionable deprivation; and (3) that the protected conduct was a motivating factor for the adverse employment action. *See Kidwell,* 679 F.3d at 964–65. Sheriff's Office Defendants assert that Plaintiffs have failed to establish any of the three elements of a First Amendment violation. They note that summary

---

[4]    The County Defendants assert that Plaintiffs must establish the elements of a constitutional tort: duty, breach, causation, injury. (County Mem. at 10.) Plaintiffs are unable to do so, Defendants urge, because they cannot establish that the County had any duty. The County Defendants note that the County Board President did not directly employ Plaintiffs and that Plaintiffs have no property interest in the security specialist position (a matter that is relevant, the court notes, to a due process claim, but not directly relevant to a patronage claim). (County Mem. at 10–12.) Employment discrimination on the basis of political activity is a species of constitutional tort, *see* 43 Am. Jur. Trials 1, §§ 2, 3 (1991), but the elements of such a claim are outlined in other terms, as set forth in the text. Whatever the merits of Defendants' reliance on tort principles, the court believes they did owe a duty to Plaintiffs not to take action against them for political reasons, even if Plaintiffs were at-will employees with no contractual right to continued employment. *See Branti v. Finkel,* 445 U.S. 507, 514 (1980) ("[E]ven an employee with no contractual right to retain his job cannot be dismissed for engaging in constitutionally protected speech."). As explained below, it appears that the County President and the Sheriff's Office had divided authority over the Plaintiffs, but this does not shield the County Defendants from liability for a First Amendment violation. (*See infra* Section III.C.)

judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The court disagrees and concludes that Plaintiffs have presented evidence sufficient to support each element.

### A. Protected Conduct

Plaintiffs have characterized their protected conduct as non-affiliation with Toni Preckwinkle. "It is undisputed that political nonaffiliation is a right protected under the first amendment." *Hermes v. Hein,* 742 F.2d 350, 354 n.3 (7th Cir. 1984) (citing *Elrod v. Burns,* 427 U.S. 347, 350 (1976)). Sheriff's Office Defendants counter that "Plaintiffs have presented no evidence of their claimed apolitical status that distinguishes them from numerous other County employees who do not participate in campaign activities." (CCSO Mem. at 7) (citing *Zerante v. DeLuca,* 555 F.3d 582, 585 (7th Cir. 2009).) First, the court notes that Defendants' argument addresses causation rather than whether the Plaintiffs' non-affiliation is protected conduct. Plaintiffs' non-affiliation with President Preckwinkle remains protected conduct regardless of whether other County employees were similarly non-affiliated. In any event, ample evidence supports the conclusion that Plaintiffs were removed from the security specialist detail because of their perceived affiliation with Todd Stroger, President Preckwinkle's political opponent. President Preckwinkle herself explained that she "never believed they could be – that I could trust them . . . because they were Todd Stroger's detail." (Preckwinkle Dep. at 25:13–16.) She confirmed, further, that she understood Todd Stroger's "detail to be associated with him[.]" (Preckwinkle Dep. at 25:17–19.) President Preckwinkle's distrust was not confined to the Todd Stroger security detail; she testified that "I didn't trust the overwhelming majority of the people that Todd brought in." (Preckwinkle Dep. at 28:11–13.) Therefore, even if Defendants are correct that Plaintiffs cannot be distinguished from other members of Stroger's administration, that assertion does not defeat the inference that their political affiliation (or non-affiliation with President Preckwinkle) motivated the decision challenged here.

23

## B.    Actual Deprivation

Next, the Sheriff's Office Defendants argue that Plaintiffs did not suffer an actionable deprivation because their transfers resulted in no loss of rank, merit, or prestige. (CCSO Mem. at 7.)  To show an adverse employment action, Plaintiffs need to present evidence of "some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm." *Atanus v. Perry*, 520 F.3d 662, 675 (7th Cir. 2008) (internal quotation marks and citation omitted).   As the Sheriff's Office Defendants themselves acknowledge, Plaintiffs received higher salaries when they were transferred to the detail. (*See* CCSO SOF ¶¶ 37–38) ("The security specialist assignment was considered a detail for which the individuals were paid a higher a higher rate of pay because they worked long and unexpected hours including weekends but did not receive overtime pay.")  A reduction in that higher pay rate or a loss of benefits plainly constitutes adverse employment action. *See Harper v. Fulton Cnty., Ill.*, 748 F.3d 761, 767 n.5 (7th Cir. 2014).  There may be questions regarding Plaintiffs' overall pay (*i.e.*, whether the higher salaries and additional work, coupled with ineligibility for overtime pay, actually resulted in greater overall net income), but those disputes are not properly resolved at summary judgment.

Moreover, apart from any pay differential, Plaintiffs' transfers may still be actionable if their transfers resulted in a loss of prestige.  "The First Amendment requires a deprivation 'likely' to deter free speech, a standard considered more lenient than the Title VII counterpart of adverse action." *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013).  Plaintiffs assert that they each "received a promotion" when they were assigned to the detail and that their transfers were "demotions." (Pls.' SAF to CCSO ¶ 21.)  Luis Santoyo testified that he was promoted when he was assigned to the detail and demoted when he was transferred back to patrol. (Santoyo Dep. at 85:14–20.)    Rosemarie Nolan, the Director of Personnel for the Sheriff's Office similarly characterized the transfers to the security detail as promotions and the transfers from the detail as demotions. (Dep. of Rosemarie Nolan, Ex. 5 to Pls.' Appendix [89-

5], hereinafter "Nolan Dep.," 48:3–12, 49:15–16.) The County Defendants have admitted that Plaintiffs received promotions and raises when they were transferred to the detail and corresponding demotions when they were transferred from it. (County Resp. to SAF ¶ 21.) This evidence supports an inference that the security detail assignment was a higher-rank or higher-prestige position, the loss of which is likely to deter free speech. Plaintiffs have, accordingly, presented sufficient evidence of an actual deprivation for purposes of summary judgment.

###    C.    Causation

The Sheriff's Office and Defendant Holbrook urge the court to grant summary judgment in their favor because Plaintiffs have not satisfied the third element of an unconstitutional political patronage claim: causation. (CCSO Mem. at 7–8.) The Sheriff's Office Defendants assert that the appropriate standard is whether the political consideration was the "but-for" cause of Plaintiffs' transfers. They maintain that no one in the Sheriff's Office was aware that political factors were at play in the decision to remove Plaintiffs from the detail. (*Id.*) Alternatively, they argue that even if someone in the Sheriff's Office was aware of the political motivations, Plaintiffs cannot establish but-for causation because the Sheriff's Office's actions were motivated, not by Plaintiffs' political affiliations, but by an attempt to "end the detail altogether," that is, an attempt by the Sheriff's Office to get "out of the security detail business" by shifting the detail to the President's Office budget so that the Sheriff's Office no longer had any authority over the detail. (CCSO Reply Brief in Supp. of Summ. J. [93], hereinafter "CCSO Reply Mem.," 6; CCSO Mem. at 9.)

At the outset, the court notes that the Sheriff's Office Defendants misstate the causation requirement. Plaintiffs are not required to show but-for causation at this stage of litigation. Rather, to survive summary judgment, they need establish only that political considerations

were a motivating factor. [5] The Sheriff's Office Defendants are correct that, to succeed at trial Plaintiffs will have to establish but-for causation, but at this stage "to establish a *prima facie* case . . . the plaintiff must produce evidence that his speech was at least a motivating factor . . . of the employer's decision." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (2012). If the plaintiff offers evidence that the protected conduct was a motivating factor, the burden shifts to the employer; if the employer cannot rebut the causal inference, the plaintiff has established the necessary but-for causation. *Id.* Thus, at summary judgment, Plaintiffs are required to show only that their protected conduct "was at least a motivating factor" in Defendants' employment decision. *Id. See also Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006) (explaining that motivating factor is a lower hurdle than but-for causation).

The Sheriff's Office Defendants try to distance themselves from the actions of the President's Office and argue that because they are a separate entity from the President's Office, the Plaintiffs cannot prove any set of facts that implicates the Sheriff's Office in the decision to transfer Plaintiffs from the detail. (CCSO Reply Mem. at 5–6.) The Sheriff's Office Defendants maintain that it was the President's Office that initiated the decision to remove Plaintiffs from the detail. They do not dispute, however, that the Sheriff's Office took the administrative actions

---

[5]    County Defendants similarly misstate that causation requirement. Relying on general constitutional tort elements, they urge that Plaintiffs must establish but-for and proximate cause to establish a *prima facie* case. County Defendants assert that Plaintiffs' "allegations are centered around the subsequent replacements," and "Plaintiffs cannot establish that hiring of Delwin Gadlin [sic], Kelvin Pope, or Keith McClendon [sic] was the proximate cause of their injury because the Plaintiffs['] detail ended when Stroger's term ended." (County Mem. at 12.) Though Plaintiffs are required to show only motivating factor causation at this stage, there is ample evidence that supports an inference that the County Defendants directly caused Plaintiffs to be transferred from the detail before hiring their replacements. President Preckwinkle testified that she refused to keep Plaintiffs on the detail because of their affiliation with Todd Stroger. (Preckwinkle Dep. at 25:13–16.) The Sheriff's Office Defendants also maintain that the Cook County Board President's office actually made the decision to end the detail and was the but-for cause of the termination. (*See* CCSO SOF ¶ 48) ("If Keller had not advised the Sheriff's Office that the President's Office intended to bring on their own people for the security detail, the Sheriff's Office would not have changed the members of the detail.") For purposes of summary judgment, this direct evidence of causation easily satisfies the causation element as against the County Defendants.

required to transfer Plaintiffs, and they admit that the Sheriff's Office had the authority to—and did in fact—transfer Plaintiffs to other positions. (See CCSO SOF ¶¶ 46, 49.) They further admit that Defendant Holbrook signed the transfer order terminating Santoyo's position in the detail and transferring him, using the "Chief's move," back to patrol. (CCSO Resp. to SAF ¶ 39; Personnel Memorandum 10-59, Ex. 25 to Pls.' Appendix [89-25].)

Instead, the Sheriff's Office disputes the motivations it had for making the transfers. According to the Sheriff's Office, it had no choice: it was simply responding administratively to the President's Office's independent decision to end the existing security detail and transfer the detail to its own budget. (See CCSO Reply Mem. at 6.) Defendant Holbrook similarly argues that signing the transfer order was nothing more than a "ministerial task" that occurred after President's Office made the final decision to end the existing detail. (CCSO Mem. at 11.) Both the Sheriff's Office and Defendant Holbrook maintain that once the President's Office articulated that it wanted to replace the detail, the detail ended, and the Sheriff's Office Defendants cannot be liable for responding to the President's Office's decision.

A jury may agree with the Sheriff's Office Defendants, but their assertions are not the only way to interpret the facts. First, the fact that the security detail was never actually transferred to the President's budget undermines the Sheriff's Office theory that they were simply "ending the detail in its entirety." Additionally, County Defendants have presented evidence, not only that the Sheriff's Office knew about the political motivations, but that Brian Towne, the Chief of Staff to the Sheriff, caused Plaintiffs to be transferred. John Keller testified that it was Towne who initially suggested replacing Plaintiffs, by asking whether President Preckwinkle wanted to remove Stroger's team. (County SOF ¶ 72.) Towne then directed Rosemarie Nolan to transfer the Plaintiffs to different positions within the Sheriff's Office. (Pls.' Resp. to CCSO SOF ¶ 49.) From these facts, a reasonable jury could conclude that Brian Towne offered to remove individuals associated with Todd Stroger and that the Cook County Sheriff's Office, through Towne, actually caused the Plaintiffs' transfers. A motivating factor may

27

be proved by either direct or circumstantial evidence. *Kidwell*, 679 F.3d at 965. Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at other employees in the protected group. *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009). A jury might infer based on Keller's testimony, the timing of the Plaintiffs' transfers, and Brian Towne's instructions to Rosemarie Nolan to end the detail, that Brian Towne initiated and directly caused the transfers.

Another reading of the facts supports the conclusion that the Sheriff's Office and Defendant Holbrook, even if they did not initiate the transfers, knew about President Preckwinkle's politically motivated decision to remove Plaintiffs and ratified or condoned that decision by effectuating the transfers. The Sheriff's Office admits that Brian Towne knew, from his conversation with John Keller, that President Preckwinkle wanted to remove anyone affiliated with Stroger from the detail. The Sheriff's Office also maintains that Towne ended the detail in response to Keller's request. (CCSO SOF ¶ 48) ("If Keller had not advised the Sheriff's Office that the President's Office intended to bring on their own people for the security detail, the Sheriff's Office would not have changed the members of the detail.") A reasonable jury could accept the Sheriff's Office's position that it was simply trying to "get out of the security detail business," (CCSO Reply Mem. at 6), but nevertheless infer that Brian Towne understood that President Preckwinkle's motivation for "ending the detail" was to permit President Preckwinkle to remove Plaintiffs from their positions because of their affiliation with Todd Stroger. This conclusion is bolstered by the fact that Towne apparently communicated President Preckwinkle's political considerations to other employees in the Sheriff's Office in order to explain why the detail was ending. For example, according to Santoyo, Defendant DeWayne Holbrook told him that the detail was ending because President Preckwinkle's administration had "their own people." (County Resp. to SAF ¶ 23.) Bill Evans, then the Police Commander, also testified that Holbrook told him that "the board president was going to have her own security detail or some words to those effect." (County Resp. to SAF ¶ 23.) From this evidence,

a jury could reasonably infer that when the Sheriff's Office, through Towne and Nolan, attempted to end the detail and Defendant Holbrook effectuated Santoyo's transfer, they did so knowing, and effectively ratifying, Preckwinkle's decision to remove the Plaintiffs based on their association with Todd Stroger.

These facts, if proven at trial, would be legally sufficient to establish causation. Sheriff's Office Defendants assert, without any citations, that "the only way Plaintiffs' claim could be plausible is to show that Cook County and the Sheriff's Office were one entity, acting of one mind, through one singular employment action." (CCSO Reply Mem. at 5.) This is an overstatement; under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), municipal agencies like the Sheriff's Office are subject to liability under § 1983 if a plaintiff can show "a constitutional injury caused *or ratified* by a person with final policymaking authority." *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009) (citations omitted) (emphasis added). For Defendant Holbrook to be individually liable under § 1983, he must have been "personally involved" in the alleged constitutional violation. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003). Plaintiffs can establish Holbrook's personal involvement if they can show that the misconduct "occur[red] at [his] direction or with [his] knowledge and consent. That is, he must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (alterations in original) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1991)). The Sheriff's Office admits that it had the authority to make the transfers, and also that it generally deferred to requests from the President's Office when assigning or removing individuals from the detail. Therefore, if a reasonable jury concludes that the Sheriff's Office, through Brian Towne or Rosemarie Nolan, ratified President Preckwinkle's decision or that Defendant Holbrook knew about the political motivations and facilitated, condoned, or turned a blind eye to those political considerations, those facts may be sufficient to establish causation.

The court's conclusion that the issue of causation should reach a jury is bolstered by the

Supreme Court's endorsement of the "cat's paw" theory of causation in employment discrimination cases. *See Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1192 (2011). Under that theory, "the discriminatory animus of a nondecisionmaker is imputed to the decisionmaker where the former has singular influence over the latter and uses that influence to cause the adverse employment action." *Staub v. Proctor Hosp.*, 560 F.3d 647, 651 (7th Cir. 2009). The Seventh Circuit has not specifically decided whether this theory is applicable in § 1983 cases, but has recognized that "this circuit and many others have also held or assumed that a cat's paw theory will support holding the *employer* vicariously liable under both § 1981 and 42 U.S.C. § 1983, which applies to local governmental entities (and state and local government employees sued in their official capacities)." *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (emphasis in original); *see also id.* at 898 ("[T]he substantial weight of authority shows that a cat's paw theory will support entity liability for retaliation under Title VII, § 1981, and § 1983."). *But see Coleman v. Dunlap,* 695 F.3d 650, 654 (7th Cir. 2012) (questioning in *dicta* whether cat's paw theory is available in § 1983 cases where vicarious liability is ordinarily inapplicable); *Waters v. City of Chicago*, 580 F.3d 575, 586 (7th Cir. 2009) (same).

The cat's paw theory is steeped in agency principles, *see Staub*, 131 S. Ct. at 1191, and therefore may not be a perfect fit here, where the allegedly discriminatory nondecisionmaker— the Cook County Board President—is not a subordinate of the alleged decision-maker, the Cook County Sheriff's Office. Nonetheless, the fact that the Seventh Circuit, along with several other circuits, has recognized the applicability of the cat's paw theory of causation within the § 1983 context suggests that motivating factor causation can be established where there is a discriminatory animus driving the adverse employment action, but divided authority over final employment decisions. Put another way, the cat's paw theory helps to flesh out, within the employment context, what it means for a municipality to "ratify," *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629, or an individual government official to "condone," *Hildebrandt*, 347 F.3d at 1039, a constitutional injury.

To invoke this theory, it will not be enough for Plaintiffs to show merely that one of the actors who participated in the transfers took improper political motivations into account. Reliance on the cat's paw theory requires plaintiffs to "produce evidence that a retaliatory motive *actually* influenced the decision-maker, not merely that it *could* have." *Brown v. Advocate Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012). Viewed in the light most favorable to Plaintiffs, the evidence is sufficient to support an inference that President Preckwinkle's motive actually influenced the actions of the Sheriff's Office and Defendant Holbrook—some even offered by the Sheriff's Defendants themselves. (*See* CCSO SOF ¶ 48) ("If Keller had not advised the Sheriff's Office that the President's Office intended to bring on their own people for the security detail, the Sheriff's Office would not have changed the members of the detail.") If Plaintiffs can establish at trial that the Sheriff's Office Defendants knew what President Preckwinkle's motivations were, and actually relied on her request to remove all of Todd Stroger's people, when implementing the transfers, those facts may establish the requisite causation.

In sum, the record presents two sets of facts that could supports a finding of causation with respect to the Sheriff's Office Defendants. First, Plaintiffs might establish that the Sheriff's Office, through Brian Towne, caused Plaintiffs to lose their positions on the detail for political reasons. Second, Plaintiffs might establish that the Sheriff's Office, Defendant Holbrook, or both, knew about Preckwinkle's political motivations and ratified or condoned them by effectuating the transfers. The Sheriff's Office Defendants may well be able to rebut these inferences at trial, but Plaintiffs have presented sufficient evidence of a *prima facie* case against both the Sheriff's Office and Defendant Holbrook to survive summary judgment.

## III. Defendant Toni Preckwinkle is entitled to qualified immunity

Toni Preckwinkle asserts the defense of qualified immunity. "Once a public official has raised a defense of qualified immunity, the plaintiff must establish two things in order to defeat the defense: first, that the facts alleged describe a violation of a protected right; and second,

31

that this right was clearly established at the time of the defendant's alleged misconduct." *Mordi v. Zeigler*, 770 F.3d 1161, 1163–64 (7th Cir. 2014). Plaintiffs bear the burden of proving the existence of a constitutional right, and that such a right was clearly established. *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 473 (7th Cir. 2011). To meet that burden, Plaintiffs will not need to establish that "the very action in question has previously been held unlawful." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). *See also Moss v. Martin*, 614 F.3d 707, 712 (7th Cir. 2010) (plaintiff is not required "to find a factually indistinguishable case on point"). Officials can be "on notice that their conduct violates established law even in the absence of earlier cases involving fundamentally similar or materially similar facts." *Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)) (internal alterations and quotation marks omitted); *see also Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996) ("Under the doctrine of qualified immunity, liability is not predicated upon the existence of a prior case that is directly on point.")

The relevant inquiry in determining whether a right is clearly established is whether a reasonable person in the official's position would have appreciated that her conduct was illegal under the circumstances. *Seiser v. City of Chicago*, 762 F.3d 647, 659 (7th Cir. 2014); *see also Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) ("A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Politically-motivated hiring, firing, and transfers of public employees is prohibited by the First Amendment; that principle is firmly established. *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004); *see also Rutan v. Republican Party of Ill.*, 497 U.S. 62, 79 (1990); *Elrod v. Burns*, 427 U.S. 347, 356–57 (1976). But this is not sufficient to overcome qualified immunity: "[t]he court cannot rely on the broad proposition that the First Amendment protects against certain political patronage firings; it must instead look to see if the violation was clear in the specific context of the case." *Moss*, 614 F.3d at 712. This standard is particularly hard to meet in the context of political patronage cases because there is "considerable uncertainty . . . in the area of

patronage law." *Flenner v. Sheahan*, 107 F.3d 459, 465 (7th Cir. 1997). The uncertainty results from the application of the Supreme Court's functional test "to a wide range of government positions, which in turn involve an endless variety of job responsibilities and varying degrees of discretion and autonomy." *Id.* Accordingly, the Seventh Circuit has cautioned that "a plaintiff has little chance of winning a case of first impression unless she occupies an extremely high or low rung on the bureaucratic ladder." *Id.* (quoting *Pounds*, 970 F.2d at 341).

President Preckwinkle argues that she was entitled to rely on the case law establishing the confidential employee exception to the First Amendment when she made the decision to remove Plaintiffs' from their positions. (County Mem. at 7–8.) Given the availability of the confidential employee exception, Preckwinkle continues, the law, as it applies to the security specialist position, is at best ambiguous. (*Id.*) Plaintiffs respond that President Preckwinkle was on notice that the positions were protected from political patronage based on the *Shakman* Consent Decree. (Pls.' Resp. in Opp. to County Defs.' Mot. for Summ. J. [84], hereinafter "Pls.' Resp. Mem to County," 19–20.) The court agrees with President Preckwinkle that the case law is ambiguous: On the one hand, *Meeks, Matlock,* and *Carlson* suggest that low-level employees with some access to confidential files are not necessarily confidential employees. On the other hand, *Benedix* suggests that a position with a close relationship and direct access to a policymaker is a confidential one for which political affiliation is an appropriate consideration. Even construing the facts in Plaintiffs' favor, security specialists fall somewhere between these two poles: As security specialists, Plaintiffs appear to have had greater access to high-level and sensitive political conversations of a chief policymaking official than the special investigators and bailiffs the Seventh Circuit considered in *Meeks, Matlock,* and *Carlson.* Plaintiffs, therefore, cannot defeat qualified immunity based on the existing case law. The question this court must address is whether, in the face of this ambiguous case law, the absence of the security specialist position from the *Shakman* exempt lists nevertheless clearly established Plaintiffs' right to First Amendment protection.

## A. Impact of *Shakman* on the Qualified Immunity Analysis

The *Shakman* Consent Decree is relevant to the qualified immunity analysis. Both the Sheriff's Office and the County were operating under that Decree at the relevant time (Pls.' Resp. to County SOF ¶ 79; County Resp. to SAF ¶ 17) and were, therefore, barred from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of government employment, with respect to one who is at the time already a government employee, upon or because of any political reason or factor." *Shakman*, 481 F. Supp. at 1358. It is undisputed that the security specialist position has never been on a *Shakman* exempt list. (County Resp. to SAF ¶ 18; *see also* CCSO Exempt List, Ex. 20 to Pls.' Appendix, [89-20], hereinafter "CCSO Shakman List".) Plaintiffs also specifically point to a variety of documents, including three memoranda regarding the new applicants for the security specialist position, which included Article W, the No Political Considerations Certificates, and a *Shakman* acknowledgement page, all implementing the terms of the Consent Decree. (Pls.' Resp. to County Defs.' at 19.)

Whether a right is clearly established often turns on existing case law. *See e.g.*, *Carroll v. Carman*, 135 S. Ct. 348, 350 (2014) (in order for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate") (quoting *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2083 (2011)). The Seventh Circuit has, however, implied that clearly analogous case law is not the only way a plaintiff can demonstrate that a right is clearly established; instead, "if there is no such case, then [the plaintiff] needs to offer a different explanation for why the constitutional violation is obvious." *Moss v. Martin,* 614 F.3d 707, 712 (7th Cir. 2010).

Plaintiffs offer the *Shakman* Consent Decree as their "different explanation" for why the Plaintiffs' constitutional right was obvious. Neither the Supreme Court nor the Seventh Circuit has held that a consent decree can "clearly establish" a right for the purposes of qualified

immunity.[6]  *Cf. Delaney v. DeTella,* 256 F.3d 679 (7th Cir. 2001) (affirming district court's

holding that law was clearly established without commenting on district court's conclusion that

consent decree put officials on notice of plaintiff's right).  The Seventh Circuit has  considered

the question at least once before.  In *Cygnar v. City of Chicago,* the plaintiffs, thirteen Chicago

police officers who had been transferred from their positions in the Office of Municipal

Investigations, urged that the *Shakman* Decree entered by the City of Chicago (the same 1972

Decree entered by Cook County), put the defendant, the new head of that office, on notice that

his personnel decisions could not be politically motivated.  865 F.2d 827, 846 (7th Cir. 1989).

The Seventh Circuit rejected the use of the *Shakman* Decree for substantive reasons, but not

because a consent decree was an inappropriate source of law:

> The plaintiffs' reliance on the so-called "*Shakman* decree" is misplaced in two
> respects.  Initially, until the district court decided *Herron v. City of Chicago,* 591
> F.Supp. 1565 (N.D. Ill. 1984), decided a month after [the challenged] transfers
> were completed (ruling that the decree covered certain promotions), it was
> unclear as to what employment actions beyond discharge the decree covered.
> *See Herron,* 619 F.Supp. 767, 769 (N.D. Ill. 1985). More importantly, it is not
> clear that the OMI investigator positions are not "exempt" from the *Shakman*
> decree based upon the confidential nature of the positions.

*Cygnar,* 865 F.2d at 846 n.19.  This language suggests that a consent decree that governs the

relevant time period and identifies a position as protected from patronage could constitute

clearly established law.  What protected defendant instead was the fact that it was not clear that

---

[6]      It is true that a consent decree cannot, by itself, create a constitutional right
enforceable through § 1983.  *See e.g., Cagle v. Sutherland,* 334 F.3d 980, 990 (11th Cir. 2003)
(consent decrees "cannot create or expand constitutional rights," therefore "a section 1983
claim cannot be based solely on a violation of the order"); *Klein v. Zavaras,* 80 F.3d 432, 435
(10th Cir. 1996); *DeGidio v. Pung,* 920 F.2d 525, 534 (8th Cir. 1990) (holding that a consent
decree "may not be enforced through a section 1983 action").  But Plaintiffs are not arguing that
the *Shakman* Decree directly created the right to be free from political patronage—that right is
firmly grounded in the First Amendment and has been reiterated in several Supreme Court and
Seventh Circuit cases.  *See Rutan,* 497 U.S. at 79; *Elrod v. Burns,* 427 U.S. 347, 356–57
(1976); *Hall v. Babb,* 389 F.3d 758, 762 (7th Cir. 2004).  Rather, Plaintiffs argue that in the
absence of particularized, analogous case law, the *Shakman* Decree, which attempts to
implement the prohibition on political patronage within the specific context of Cook County and
the Sheriff's Office, put President Preckwinkle on notice that she could not take political factors
into account when deciding to remove them from the detail.

the employment positions at issue in *Cygnar* were not exempt—a consideration equally relevant here.[7]

Even where a consent decree dictates particular remedies, it may not be sufficient to put a public official on notice of a constitutional violation. A decree "must be directed to protecting federal interests," but it "may require the state officials to take some steps that the statute [or constitutional provision] does not specifically require." *Frew v. Hawkins*, 540 U.S. 431, 903–04 (2004). Thus, if the remedies imposed by a consent decree exceed what is required to correct a constitutional violation, then the consent decree does not accurately reflect the contours of a constitutional right. *See Corners v. Saccocia,* 43 F.3d 1456 (1st Cir. 1995) (*per curiam*) (although consent decree was "designed to implement various constitutional protections, not every violation of those rules results in a claim of constitutional dimension" and the decree therefore does not provide guidance on what is constitutionally required.) The court, accordingly, takes a close look at the *Shakman* Decrees as applied to the County and to the Sheriff's Office, to determine whether they do reliably put a public official on notice of a violation in this particular factual context.

In making that determination, the court recognizes that the decrees impose broad protections. The 1972 decree prohibits the County from "conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment with respect to one who is at the time already a governmental employee, upon or because of any political reason or

---

[7]     Other Circuits that have considered the question have also acknowledged that consent decrees can define the contours of a constitutional right. *See Rivera-Jimenez v. Pierluisi*, 362 F.3d 87, 95 (1st Cir. 2004) (magistrate judge appropriately examined existing case law by looking to a consent decree entered in a case similar to plaintiffs'); *Hundley v. Parker*, 69 F.3d 537, *5 (6th Cir. 1995) (consent decree helped to define clearly established law, but the terms of the decree were insufficient to put defendants on notice of the particular right); *Green v. McKaskle*, 788 F.2d 1116, 1122–23 (5th Cir. 1986) ("A remedial decree affirmed on appeal might be important for purposes of providing notice to prison officials of clearly established rights"); *Williams v. Bennett*, 689 F.2d 1370, 1386 (11th Cir. 1982) ("[Remedial court] order not only clearly defined the constitutional rights of the Alabama prisoners, but also served to put the defendant[s] on notice."); *Jackson v. State of Mississippi*, 644 F.2d1142, 1146 (5th Cir. 1981) (remedial decree "clearly established . . . constitutional rights").

factor." *Shakman v. Democratic Org. of Cook Cnty.*, 481 F. Supp. at 1358 (1972 Consent Decree appears in appendix). In 1994, the County entered a subsequent Consent Decree that extended protections to cover County hiring practices. (Judgment, *Shakman v. Democratic Org of Cook County et al.*, No. 69-cv-2145 [Docket Entry 1/07/1994], hereinafter "1994 Decree".)[8]

A similar pair of decrees governs hiring and firing by the Sheriff's Office. The first, entered in 1980, prohibited political patronage practices for employment decisions related to current employees,[9] and a second decree, entered in 1983,[10] extended protections to cover hiring practices. *Shakman v. Democratic Org. of Cook Cnty.*, 569 F. Supp. 177, 178 (N.D. Ill. 1983). In 1979, the district court held that the Sheriff's Office "independently infringed the plaintiffs' constitutional rights through their use of patronage hiring, firing, and promotion practices." *Shakman v. Democratic Org. of Cook Cnty.*, 481 F. Supp. 1315, 1349 (N.D. Ill. 1979) *vacated sub nom. Shakman v. Dunne*, 829 F.2d 1387 (7th Cir. 1987). The 1983 Decree was explicitly "entered to provide relief for the violations of plaintiffs' rights as determined in the September 24, 1979 order and to prevent further such violations." *Shakman v. Democratic Org. of Cook Cnty.*, 569 F. Supp. 177, 178 (N.D. Ill. 1983).

Though broadly worded, the Decrees specifically incorporated Supreme Court doctrine

---

[8]     A copy of the 1994 Consent Decree is available on the website established by the Cook County Shakman Compliance Administrator: http://www.countyshakman.com/ downloads /cc_shakman_1994Judgment.pdf.

[9]     The court has been unable to locate a signed copy of the 1980 Consent Decree, but it is referenced in a 2008 Supplemental Relief Order, (Supplemental Relief Order for the Sheriff of Cook County, *Shakman v. Sheriff of Cook Cnty., et al.*, 69-cv-2145 [869], 1,) and in subsequent litigation. *See Shakman v. Democratic Org. of Cook Cnty.*, 569 F. Supp. 177, 178 n.2 (N.D. Ill. 1983) ("On June 27, 1980, the Consent Decree was entered binding the Cook County Sheriff and the Chicago Park District"). An unsigned copy is attached to this decision as an appendix.

[10]     The Consent Decree appears to have been entered April 4, 1983, but the 2008 Supplemental Relief Order refers to this Decree as the "1984 Decree," perhaps because the first annual report was due in 1984. *See Shakman v. Democratic Org. of Cook Cnty.*, 569 F. Supp. 177, 181–82 (N.D. Ill. 1983).

governing exceptions to First Amendment protections, as well. The 1980 Sheriff's Office

Decree, which prohibits conditioning employment on political factors (Appendix, 1980 Sheriff's

Office Decree ¶ E(1)), recognized exemptions from its protection for certain positions:

> Certain Governmental Employment positions under the jurisdiction of the Sheriff of Cook County by their nature involve policy-making to such a degree or *are so confidential in nature* as to require that discharge from such positions be exempt from inquiry under this Judgment. Jurisdiction is maintained to litigate the question of which Governmental Employment positions under such defendant's jurisdiction are so exempt for the foregoing reasons.

(*Id.* ¶ K(1)(a)) (emphasis added).) The 1983 Decree that bound the Sheriff's Office with respect

to hiring practices similarly stated:

> Defendant Public Employers may, from time to time, apply to the Court for a determination that *political party affiliation or activity are appropriate requirements for the effective performance* of certain Governmental Employment positions and therefore that hiring for or discharge from such positions should be exempt from inquiry under this Judgment and the Consent Judgments. Prior to entry of an order of Court determining a position to be an Exempt Position, no position shall be exempt from this Judgment.

*Shakman v. Democratic Org. of Cook Cnty.*, 569 F. Supp. 177, 182 (N.D. Ill. 1983) (emphasis

added). This language from the Sheriff's Office Decrees effectively parallels the test

established by the Supreme Court in *Branti v. Finkel*, to identify those positions that are exempt

from the general prohibition on political patronage. 445 U.S. 507, 518 ("[T]he question is

whether the hiring authority can demonstrate that party affiliation is an appropriate requirement

for the effective performance of the public office involved.") Then in 2008, a Supplemental

Relief Order ("SRO") established a protocol that required the Sheriff's Office to develop a

comprehensive list of positions "exempt" from the hiring procedures established by the Decrees

and the SRO. *See* Supplemental Relief Order for the Sheriff of Cook County, *Shakman v.

Sheriff of Cook Cnty.*, No. 69-cv-2145 [869], hereinafter "SRO," 6. The Sheriff was tasked with

developing the list and was required to "present the new list of Exempt Positions to Plaintiffs'

Class Counsel for comment and discussion in a good faith effort to reach agreement on the list."

SRO at 6. The court retained jurisdiction to approve the final list and to mediate any disputes

between the parties regarding the list of exempt positions. SRO at 6–7.

The 1994 Decree governing the County's hiring practices similarly attempted to align *Shakman*-protected positions with the test outlined in *Branti*. That Decree granted the Cook County Board President the authority to designate 500 employees as "exempt" if "the job involved policy making to an extent or is confidential in such a way that political affiliation is an appropriate consideration for the effective performance of the job . . . ." 1994 Decree ¶¶ O (1), (3). (*See* Cook County *Shakman* Exempt List, Ex. A to *Shakman* Exempt Lists, Ex. 20 to Pls.' Appendix, [89-20], hereinafter "Shakman Lists," n.1)

### B. *Shakman* Decree does not defeat qualified immunity

If the security specialist position appeared on a *Shakman*-exempt list, there is little doubt that President Preckwinkle could have relied on it in her decision in this case. The list would provide a safe harbor, much like a job description would. But the converse is not obviously true. The court is not convinced that the *absence* of security specialist positions from the *Shakman* exempt lists—which are byproducts of the Decrees—means that those positions are necessarily subject to the First Amendment patronage ban. That is, the absence of the security specialist position from *Shakman*-exempt lists did not by itself put President Preckwinkle on notice that she acted at her peril in terminating Plaintiffs for political reasons.

Construing facts in their favor, Plaintiffs have established a constitutional violation. As the court's discussion in Section I reveals, however, that is by no means an obvious conclusion: whether Plaintiffs are entitled to First Amendment protection turns on disputed facts. Even if Plaintiffs do establish a constitutional violation at trial, this violation will not justify holding President Preckwinkle personally liable. The doctrine of qualified immunity is propelled by a concern that government officials "need not predict, at their financial peril, how constitutional uncertainties will be resolved." *Hosty v. Carter*, 412 F. 3d 731, 739 (7th Cir. 2005). This concern is particularly acute in public employment cases because newly-elected officials face "a dilemma . . . How [are they] to know, when [they] take office, whom [they] can fire and replace

with loyalists, and whom not?" *Riley v. Blagojevich*, 425 F.3d 357, 360 (7th Cir. 2005). The *Shakman* exempt lists provide guidance, but the court is unwilling to conclude that every violation of the Decree necessarily reflects a violation of a constitutional right. In particular, the 1972 Decree governing County discharge practices was entered without any finding of a constitutional violation; the Decree governing President Preckwinkle when she took office is, thus, arguably the least tethered to constitutional requirements and most likely to require remedies that exceed those constitutional parameters. Moreover, the 1994 Decree governing County hiring practices established an arbitrary cap on the number of exempt positions the County could designate, a requirement unrelated to the concerns of the First Amendment, further undermining the connection between the Decrees and the First Amendment. Despite its absence from the *Shakman* exempt lists, the security specialist position may nonetheless fall within an exception to First Amendment protection: the *Shakman* Decrees alone cannot overcome the ambiguity in the case law.

For similar reasons, the Sheriff's Office Decrees by themselves do not satisfy the court that President Preckwinkle should have known that Plaintiffs' positions were not confidential. The *Shakman* exempt lists that Plaintiffs rely on were the product of negotiation between the parties rather than the result of an in-depth analysis of each position's unique functions. *See e.g.*, SRO at 6 (Sheriff developed the exempt list and then "present[ed] the new list of Exempt Positions to Plaintiffs' Class Counsel for comment and discussion in a good faith effort to reach agreement on the list.") Absence from the list could, therefore, be the result of horse trading between the parties, of simple oversight, or of some other factor related to the negotiations. Given the divided authority over the security detail, and the fact that there was no job description or hiring process in place when President Preckwinkle took office, the parties' oversight seems as likely an explanation for the position's absence from the list as an explicit effort to protect those positions. In this context, mere absence from the exempt lists, without more explicit language or protections, did not sufficiently establish Plaintiffs' First Amendment

rights at the time Plaintiffs were transferred.

Finally, the court pauses to note that there is evidence that President Preckwinkle herself was genuinely uncertain about whether she was free to bring in her own security staff, and asked whether that was "possible" under the relevant personnel rules. This uncertainty counsels in favor of immunity: "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). There was no job description in place, no hiring procedure established (despite the fact that the Sheriff's Office was actively working with the *Shakman* compliance monitor at the time), and no case law directly addressing the issue. Indeed, what limited guidance was available to President Preckwinkle suggested that the transfers were lawful; there is evidence that Sheriff's Office staff assured Ms. Preckwinkle's chief of staff that every Board President had hired his or her own security detail. Had Ms. Preckwinkle looked to past practice, she would have found some corroboration for that assertion: Though Plaintiffs now urge that political hiring and firing of employees in their position was a clearly-established violation, at least two of the Plaintiffs themselves appear to have been hired by Todd Stroger as a reward for their volunteer service to his campaign, well after imposition of the *Shakman* Decrees.

In short, given the considerable uncertainty surrounding the security specialist positions, even in light of the *Shakman* exempt lists, a reasonable person in President Preckwinkle's position would not have known that transferring Plaintiffs was unlawful. Plaintiffs have not met their burden to show that their right was clearly established. President Preckwinkle is, therefore, entitled to qualified immunity.

## CONCLUSION

Plaintiffs have presented sufficient evidence to establish a *prima facie* case of a political patronage employment decision, and Defendants have not shown that the security specialist position is exempt from First Amendment protections as a matter of law. The *Shakman*

Decrees confirm that political hiring and firing by the Sheriff's Office and Cook County is unlawful absent certain exemptions, and it is undisputed that the security specialist position is not listed as *Shakman*-exempt. Plaintiffs have not established, however, that the position is protected by the First Amendment as a matter of law, such that Ms. Preckwinkle was on notice of Plaintiffs' purported right. Cook County Board President, Toni Preckwinkle, is thus entitled to qualified immunity. The County Defendants' motion for summary judgment [77] is granted with respect to President Preckwinkle and denied with respect to Cook County. The Sheriff's Office Defendants' motion for summary judgment [72] is denied.

ENTER:

Dated: February 4, 2015

REBECCA R. PALLMEYER
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL L. SHAKMAN and PAUL ) 
M. LURIE et. al., )
)
        Plaintiffs, )
)
        vs. )       No. 69 C 2145
)
THE DEMOCRATIC ORGANIZATION )
OF COOK COUNTY et. al., )
)
        Defendants. )

## CONSENT JUDGMENT
## OF SHERIFF OF COOK COUNTY

    Plaintiffs Michael L. Shakman and Paul M. Lurie have filed their First Amended Complaint as supplemented. The plaintiffs (on behalf of themselves and the classes they represent under the First Amended Complaint as supplemented, as determined by previous Orders of Court) and defendant Richard J. Elrod, individually and as Sheriff of Cook County, Illinois ("Sheriff Elrod"), have filed cross-motions for summary judgment herein. The Court entered its opinion and findings of fact on September 24, 1979, which partially granted and partially denied the cross-motions for summary judgment. Plaintiffs and defendant Sheriff Elrod have agreed that it is in the best interest of these parties to avoid further protracted appellate and trial court litigation of the issues settled by this Judgment and have agreed to the entry of this Consent Judgment on such issues with respect to the persons named or referred to in paragraph C below. It is understood that this disposition of this aspect of the litigation does not constitute an admission on the part of defendant of any liability or wrongdoing as alleged in the complaint or as stated in the findings of fact, nor any admission of or concurrence in the rationale of a constitutional infringement as found and held to arise in the order of September 24, 1979.

    Now, therefore, upon the consent of the plaintiffs and Sheriff Elrod, it is Ordered, Adjudged and Decreed as follows:

    A. This Court has jurisdiction of the parties to this Judgment and of the subject matter of this action under Sections 1331 and 1343(3) of Title 28 of the United States Code.

B.   As used in this Judgment (1) the term "Governmental Employment" means any employment (whether full-time or part-time, permanent or temporary, and regardless of whether the employment is paid for by federal funds) within the Northern District of Illinois by or for the County of Cook or any other non-federal governmental entity; (2) the terms "Governmental Employee" and "Employee" mean a person employed in Governmental Employment.

C.   The provisions of this Judgment apply to Sheriff Elrod, individually and as a public officeholder, his successors as such public officeholder, the present and future agents, servants, employees and attorneys of Sheriff Elrod and others named or referred to herein-above, and all others in active concert or participation with Sheriff Elrod or others named or referred to above who receive actual notice of this Judgment by personal service or otherwise.

D.   It is declared that compulsory or coerced political financial contributions by any Governmental Employee, contractor or supplier, to any individual or organization and all compulsory or coerced political activity by any Governmental Employee are prohibited, and, once hired, a Governmental Employee is free from all compulsory political requirements in connection with his employment.  However, Governmental Employees may engage on a voluntary basis, on their own time, in any lawful political activity (including the making of political financial contributions).

E.   Sheriff Elrod and all others named or referred to in paragraph C above are permanently enjoined from directly or indirectly, in whole or in part:

(1)   conditioning any governmental employment or any term or aspect of such employment (including but not limited to firing, layoff, promotion, demotion, compensation, job assignment, transfer or benefits) upon any employee's (a) past, present or future political support of, or sponsorship by or affiliation or connection with, any political party or any official or associate of any political party or any candidate for public office or any program, position or project of any such political party, official or associate, or (b) lack of such political support, sponsorship, affiliation or connection; or determining, basing or knowingly prejudicing or affecting any aspect of Governmental Employment, with respect to one who is at the time already a Governmental Employee, on the basis of such political support, sponsorship, affiliation or connection, or lack thereof; or taking any action of a punitive or prejudicial nature or effect against any employee relating to his or her employment based upon such political support, sponsorship, affiliation or connection, or lack thereof, or the employee's political beliefs or lawful political activity of any kind or lack of political activity.  Nothing in this judgment shall prohibit the disciplining of governmental employees for engaging in political activity in violation of any law.

-2-

(2) knowingly causing or permitting any Employee to do any partisan political work during the regular working hours of his or her Governmental Employment, or during time paid for by public funds; provided that nothing contained in this subparagraph E (2) shall prohibit Governmental Employees from voluntarily using vacation time, personal leave time or from taking nonpaid leaves of absence to do political work, but permission to do so must be granted nondiscriminatorily.

(3) knowingly inducing, aiding, abetting, participating in, cooperating with or encouraging the commission of any act which is proscribed by this paragraph E, or threatening to commit any such act.

F. Sheriff Elrod will cause a copy of the "Notice", a copy of which is attached hereto, together with a copy of this Judgment, to be delivered within 30 days of the entry of this Judgment to (1) all Governmental Employees of the Sheriff of Cook County, and (2) all persons who have any responsibility for any personnel decisions affecting Governmental Employees of the Sheriff of Cook County.

G. Sheriff Elrod or his successors in office are directed for a period of ten years following the entry of this Judgment to cause copies of the Notice referred to in paragraph F of this Judgment, together with a copy of this Judgment, to be delivered to (1) all Governmental Employees hereafter employed by the Sheriff of Cook County, (2) all Governmental Employees whose Governmental Employment by the Sheriff of Cook County is hereafter terminated, and (3) all persons hereafter assuming any personnel responsibility as described in paragraph F of this Judgment. Such Notice shall be delivered to such persons within 15 days of such employment, termination or assuming any such personnel responsibility, as the case may be.

H. A copy of this Judgment and the Notice shall be posted in a prominent place at each place where persons may make applications for employment with the Sheriff of Cook County. Such copies shall remain posted for a period of ten years following the entry of this Judgment and shall state that copies of the Notice and of this Judgment are available to any person who requests them.

I. Sheriff Elrod shall cause to be filed with the Clerk of this Court within 45 days of the entry of this Judgment and on or before each January 1 thereafter for a period of ten years following the entry of this Judgment an affidavit showing compliance with paragraphs F, G and H for the period since the date of the most recent affidavit.

J.   Except as provided in Paragraph K, this Judgment represents the agreed-to disposition of the claims asserted in this case by plaintiffs Michael L. Shakman and Paul M. Lurie, on behalf of themselves and the classes referred to above, against Sheriff Elrod, and Plaintiffs' claims for money damages, compensatory and exemplary, against Sheriff Elrod are hereby dismissed.

K.   Jurisdiction is retained for the following purposes:

(1)   To enable the parties to this Judgment to continue to litigate the following questions before this Court:

(a)   Certain Governmental Employment positions under the jurisdiction of the Sheriff of Cook County by their nature involve policy-making to such a degree or are so confidential in nature as to require that discharge from such positions be exempt from inquiry under this Judgment. Jurisdiction is maintained to litigate the question of which Governmental Employment positions under such defendant's jurisdiction are so exempt for the foregoing reasons.

(b)   On September 24, 1979, this Court entered its decision granting plaintiffs' Partial Summary Judgment on the question of the lawfulness of defendants' conditioning, basing or affecting the hiring of Governmental Employees upon or because of any political reason or factor.  The parties reserve their rights to further litigate such hiring decision and the remedies therefore.

(c)   There is currently pending in the United States District Court for the Northern District of Illinois Eastern Division an action entitled <u>Burns et al. v. Elrod</u> No. 71C607 (the "Burns Case"), which involves claims by employees discharged by Sheriff Elrod for allegedly political reasons. Because of the pendency of the Burns Case, jurisdiction is maintained to determine what further relief, if any, should be granted as to those employees of the Sheriff of Cook County whose employment has been involuntarily terminated or not renewed since December 7, 1970.

(d)   What remedies and implementing procedures ought to be granted and established by the Court in connection with the resolution of the questions raised in the foregoing subparagraphs (a), (b) and (c)?

(e)   Plaintiffs costs and attorneys fees.

(2) To enable the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Judgment, for the enforcement of compliance with the provisions contained herein, and for the punishment of the violation of any of such provisions. Application to enforce such provisions or to impose punishment for any such violation may be presented to this Court by any registered voter. Prior written notice of all such applications and other matters in this action shall be given to the named parties hereto.

L. The Court expressly finds and determines, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay. It directs that this Judgment be entered forthwith and be effective upon its entry.

ENTER:

_____
District Judge

Dated:_____

<u>IMPORTANT NOTICE</u>

TO:   ALL EMPLOYEES OF THE SHERIFF OF COOK COUNTY.

On_____, 1980, a Judgment was entered in the
U. S. District Court for the Northern District of Illinois in the
case of <u>Michael L. Shakman et al.</u> v. <u>The Democratic Organization
of Cook County, etc.,...the Republican County Central Committee of
Cook County</u>, et al., No. 69 C 2145.

The provisions of the Judgment are very important to you as a
governmental employee.  Only a few of its provisions are
summarized in this notice; there are many others you may want to
read.  The Judgment can be obtained for reading and copying at the
Office of the Clerk of the District Court, on the 20th Floor of
the U. S. Courthouse, at 219 South Dearborn Street, Chicago,
Illinois.

By its terms, the Judgment is legally binding, permanently, on
all of the defendants covered by it, on their successors in
office, and on others.

Among its provisions, the Judgment prohibits compulsory or
coerced political financial contributions or political activity by
any city, county, state or other non-federal governmental
employee.  <u>The Judgment covers you</u>.  It applies to you whether or
not you are a temporary or permanent employee, work full-time or
part-time, or are covered or not covered by civil service.  (The
only employees <u>not</u> covered by the Judgment are those who the court
later determines hold employment positions which involve
policy-making to such a degree or which are so confidential as to
require that those positions be exempted.)

The Judgment does not prohibit voluntary political activity.
Therefore as a voluntary matter, you may do any political work on
your own time or make any political financial contributions you
wish which are otherwise legally permissible, but your employment
cannot be affected one way or the other by whether you do or do
not do so.

The Judgment declares that, "once hired, a governmental
employee is free from all compulsory political requirements in
connection with his employment," and it enjoins the defendants
(and others) from "determining, basing or knowingly prejudicing

or affecting any term or aspect of governmental employment...on the basis of such political support, sponsorship, affiliation or connection or lack thereof". This means that you <u>cannot</u> be required:

1. To do work for a political candidate or political party;

2. To make political financial contributions;

3. To raise money for a political cause;

4. To obtain or to maintain the sponsorship of any political party, organization or official.

Likewise you cannot be required to refrain from doing any of these things for any political candidate or party you prefer.

Under the Judgment you cannot be discharged or demoted, not retained in temporary employment, not promoted, or otherwise punished or discriminated against or affected in your governmental employment because of your political affiliation, activity or contributions for any party or candidate, or the lack of such affiliation, activity or contributions. It is also a violation of the Judgment for any person bound by the Judgment to threaten any of such prohibited acts.

The Judgment also prohibits permitting a governmental employee to do political work during working hours for which he is receiving government pay.

Any registered voter is entitled to bring complaints concerning any violations of the Judgment before this U. S. District Court in accordance with the provisions of paragraph K(2) of the Judgment.

The Judgment requires that notice of it be given to present and future employees of the Sheriff of Cook County.

Nothing in the Judgment eliminates or alters any requirement that governmental employees perform the duties of their governmental jobs in a satisfactory manner.


Dated:_____, 1980


                          _____
                          Judge of the United States District
                          Court